## AFFIDAVIT OF DAVID M. BRETON

I, David Breton, being duly sworn, depose and state as follows:

1. Since November 2005, I have been a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"). I completed Basic Postal Inspector Training in Potomac, Maryland. As a Postal Inspector, I am responsible for investigations involving theft of United States mail, obstruction of United States mail, mail fraud, and other criminal activities involving the use of the mail, including the illegal distribution of controlled substances through the United States Mail.

2. I have participated in several aspects of drug investigations, including conducting surveillance, executing search warrants, and executing arrests. In many of these investigations, including this one, I work closely with and share information and intelligence with experienced drug investigators from other law enforcement agencies, including the Federal Bureau of Investigation, the Drug Enforcement Agency, the Massachusetts State Police and local police departments.

3. I have participated in numerous search warrants resulting in the seizure of: (a) large quantities of controlled substances: (b) drug-related paraphernalia involved; (c) cash proceeds from the sale of controlled substances; (d) records of drug transactions; (e) drug customer lists; and (f) other documents relating to the manufacturing and distribution of controlled substances.

## PURPOSE OF THE AFFIDAVIT

4. I make this affidavit in support of a search warrant to search the cellular telephone belonging to Emmanuelli Rojas MORAZA (the "Subject Phone"). As described in Attachment A, the Subject Phone is a black LG cellular telephone, bearing IMEI number 355382099498738 and MEID number 35538209949873. The Subject Phone is assigned Sprint telephone number

(401) 516-5291 and Sprint subscriber information lists the subscriber of record as Emmanuel Rojas. The items that I seek to search and seize are more fully described in <u>Attachment B</u>.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that MORAZA has violated 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) (the "Target Offense"). There is also probable cause to believe that evidence, fruits, and instrumentalities of violations of the Target Offense will be found within the Subject Phone.

6. The information contained in this affidavit is based on my personal participation in the investigation, as well as information provided by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

## PROBABLE CAUSE

**General Information Regarding Drug Distribution**

7. Based on my training and experience, I know that individuals involved in drug distribution often use cellular phones like the Subject Phone as part of their drug activities. I know that cellular phones often contain the names and contact information for co-conspirators. I further know that drug dealers often maintain copies of records, receipts, diaries, notes, ledgers, travel documents and correspondence related to their drug activities on their cell phones. I further know that persons involved in drug activities often keep detailed writings concerning monies owed and customer and supplier lists on their cell phones. Cell phones can also include account numbers and shipping information related to drug activities. I know that individuals involved in trafficking of narcotics via the US Postal Service often utilize the parcel tracking

feature of the USPS.com website and the USPS mobile application, both of which can be accessed from a cell phone. The US Postal Service website and mobile application can provide both text and email alerts regarding packages.

8.      Based on my training and, I know that drug dealers will often communicate with co-conspirators from one location, while having contraband delivered to different locations, or "drop addresses," in an attempt to avoid being connected to the narcotics and to elude law enforcement.

**April 25, 2019 Package of Cocaine**

9.      I previously obtained a search warrant for a package mailed to MORAZA in April 2019 ("Package 1") that contained approximately one kilogram of a substance that tested positive for the presence of cocaine. (Docket No. 19-mj-4266).

10.     Prior to obtaining the search warrant, I spoke with the USPS supervisor at the Clinton, Massachusetts Post Office, who told me that MORAZA had come into the post office on April 25, 2019. MORAZA reported that he had recently relocated from Puerto Rico and he was expecting a package containing his personal belongings to be delivered on April 27, 2019. MORAZA further stated that he lives at 183 Pleasant Street in Clinton. MORAZA provided the supervisor with a handwritten piece of paper containing the USPS tracking number 9505 5114 5513 9114 1759 36, his name, address and the telephone number of (401) 516-5291 assigned to the Subject Phone.

11.     On April 29, 2019, the Court issued the search warrant for Package 1. Package 1 was addressed to "Emmanuelli Rojas, 183 Pleasant Street Apt 2L-First Floor, Clinton, MA 01510" and assigned USPS tracking number 9505 5114 5513 9114 1759 36. The return address listed was "Faviana Rojas, Calle Luis Munoz Rivera #57 bajos, Toa Alta P.R. 00953." I checked

the return address information for Package 1 in the CLEAR investigative database.  The CLEAR investigative database returned negative results for "Faviana Rojas" as associated with that address or any address in Toa Alta, Puerto Rico.  The CLEAR database also returned negative results for the address of "Calle Luis Munoz Rivera #57 bajos, Toa Alta P.R. 00953," but indicated that "57 Calle Luis Munoz Rivera, Toa Alta, P.R. 00953" was a real address.  I know from my training and experience that people involved in drug distribution through the mail often use false return address information.

12. Agents found approximately one kilogram of an off-white powder that field tested positive for cocaine inside Package 1.  The substance was wrapped in saran wrap, a vacuum sealed bag, and hidden in purple wax within a small soft black lunch bag.  The black lunch bag had images of white flowers on the outside of it.  Agents seized this package and it was not delivered to MORAZA.

13. Approximately five months later, on September 13, 2019, MORAZA returned to the Clinton Post Office and again inquired as to the whereabouts of Package 1.  MORAZA provided a handwritten piece of paper containing his name, the same USPS tracking number for Package 1 (9505 5114 5513 9114 1759 36), the name Fabiola Rojas, which is similar to the name "Faviana Rojas" which was found handwritten in the return section of Package 1, and again provided the telephone number of (401) 516-5291 assigned to the Subject Phone.  MORAZA was not provided with any package on that day, but USPS employees advised me that he had returned to the Post Office looking for Package 1.

**January 24, 2020 Package of Cocaine**

14. On January 24, 2020, I obtained a search warrant for a second package mailed to MORAZA that also contained approximately one kilogram of a substance that field-tested

positive for the presence of cocaine ("Package 2"). (Docket No. 20-mj-4005). Package 2 was addressed to "Emmanuelli Rojas, 183 Pleasant Street Apt 1L, Clinton, MA 01510" and was assigned USPS tracking number 9505 5111 1471 0021 7918 99. The return address listed on Package 2 was "Carlos Delgado Fuentes, San Mateo Plaza #1626 Apt. 104, San Juan PR 00912." I checked the CLEAR investigative database for information related to the return and recipient address information. According to CLEAR, "Emmanuelli Rojas" currently resides at 183 Pleasant Street Apt 1.[1] CLEAR further showed that the recipient address of San Mateo Plaza #1626 Apt. 104 is a valid address in Puerto Rico, but not one by the name of "Carlos Delgado Fuentes" has used or is currently using that address.

15. Agents searched Package 2 on January 24, 2020 and it contained approximately one kilogram of an off-white powder that field tested positive for cocaine. This substance was boxed very similar to Package 1. It was wrapped in saran wrap, a vacuum sealed bag, and hidden in purple wax within a small soft black lunch bag. The black lunch bag had images of white flowers on the outside of it.

16. After searching Package 2, agents reassembled it and put it back into the original USPS package for a controlled delivery to MORAZA. On January 24, 2020, at approximately 1:45 pm agents set-up covert surveillance in the area of 183 Pleasant Street, Clinton, MA, the residence to which Package 2 was addressed.

17. At approximately 2:24 pm that same day, I dressed as an undercover USPS mail carrier and drove to 183 Pleasant Street in a USPS vehicle. I left a USPS notice of delivery slip

---

[1] USPS records also show that "Emmanuelli Rojas" currently receives mail at this address.

on the mailbox marked "1L" located to the left of the front door advising the recipient that Package 2 was available for pick up at the Clinton Post Office.

18. As I was walking back towards the USPS vehicle, a Hispanic male who I know to be MORAZA exited the front door of 183 Pleasant Street. MORAZA took the USPS delivery slip from the mailbox. MORAZA looked towards me and I advised him that I did not have the package, but that it was available for pick up at the Clinton Post Office. I then drove away from the area and returned to the Clinton Post Office.

19. At approximately 2:26 pm, agents observed MORAZA leave 183 Pleasant Street on foot while holding the USPS delivery slip. As he walked, agents observed MORAZA using his cellular phone on several streets heading in the direction of the Clinton Post Office located at 320 High Street in Clinton.

20. At approximately 2:39 pm, MORAZA entered the Clinton Post Office. MORAZA gave the delivery slip to a USPS employee, who advised Rojas to knock on the blue door directly outside the customer service area and to wait for someone to assist him there. MORAZA then knocked on the blue door. I met MORAZA at the door still dressed as an undercover USPS mail carrier. MORAZA provided the delivery slip to me and I asked if he was expecting a package from Puerto Rico. MORAZA responded "yes" and I asked him for an ID. MORAZA provided a Massachusetts Identification Card displaying his photograph and personal identifying information. MORAZA then signed his name and address on the back of the delivery slip at my direction and I scanned the package "as delivered" and handed it to MORAZA.

21. MORAZA then exited the front door of the Post Office carrying Package 2. Agents immediately approached MORAZA and arrested him on state narcotics charges. MORAZA was then transported to the Clinton Police Department for booking.

22. During his arrest, agents seized Package 2 and the Subject Phone. During his booking, MORAZA provided his phone number as 401-516-5291 and also provided written consent for law enforcement to search his cell phone. During a cursory search of the cell phone, law enforcement agents located a photograph of a USPS receipt displaying the USPS tracking number, mailing cost, mailing date, and location for which Package 2 was mailed from Puerto Rico. The tracking number on the receipt matched the tracking number located on Package 2. Agents also discovered that the USPS mobile application had been downloaded to the phone. I know that the USPS mobile application can be used to track packages like the Subject Package, and that it can provide text and email alerts to a package recipient like MORAZA.

23. Also during this brief search, agents noted that there were phone calls with phone number (787) 600-xxxx.[2] The exchange 787 serves Puerto Rico. The two calls were at 2:33 pm and 2:37 pm, which is the time period when agents observed MORAZA walking to the Post Office to retrieve Package 2.

24. In summary, there is probable cause to believe that the Subject Phone will have evidence related to the Target Offense because (a) the consent search revealed that MORAZA had a photograph of the USPS receipt for the shipment of Package 2; (b) the USPS Mobile App was loaded onto the Subject Phone; (c) MORAZA was seen using the phone immediately after I left the USPS delivery slip at his residence on his way to pick up the package at the Post Office; (d) MORAZA had phone calls with a phone number in Puerto Rico, which is where Package 2 originated, as he walked to the Post Office; (d) MORAZA provided the phone number assigned to the Subject Phone to the USPS in connection with Packages 1 and 2; and (e) I know that

---

[2] I provide a redacted phone number, but know the complete phone number.

individuals like MORAZA who are involved in drug dealing commonly use cell phones as part of their drug activities. A search of the Subject Phone could reveal the identities of other individuals involved in drug activities with MORAZA.

### SEARCH OF CELLULAR TELEPHONE

25. Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet, including social media sites like Facebook, Instagram and Snapchat.

26. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities on their cellular telephones. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or

specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in <u>Attachment B</u> on their cellular telephones.

27. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

28. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the

device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

29. Based on foregoing, there is probable cause to believe that MORAZA has committed the Target Offense. Furthermore, there is probable cause to believe that the Subject Phone was used to commit the Target Offense and/or will contain evidence of the Target Offense; Therefore, I respectfully request the Court issue a search warrant of the Subject Phone as described in Attachment A to seize those items and evidence as described in Attachment B.

_____
David Breton
U.S. Postal Inspector

Sworn to before me on this  5th  day of February, 2020.

_____
Honorable David H. Hennessy
United States Magistrate Judge